IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | OPINION AND ORDER |
|---|---|
| | 14-cv-638-bbc |
| Plaintiff, | |
| v. | |
| FLAMBEAU, INC., | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Equal Employment Opportunity Commission has filed this civil action against defendant Flambeau, Inc., alleging a violation of the Americans with Disabilities Act. Specifically, plaintiff contends that defendant violated 42 U.S.C. § 12112(d)(4)(A), which generally prohibits employers from requiring their employees to submit to medical examinations, by conditioning participation in its employee health insurance plan on completing a "health risk assessment" and a "biometric screening test." Defendant responds with the argument that although requiring employees to complete the risk assessment and biometric test might violate § 12112(d)(4)(A) in some circumstances, here the assessment and testing requirement fell within the ADA's "safe harbor," which provides an exemption for activities related to the administration of a bona fide insurance benefit plan. Defendant also contends that plaintiff's claim fails because completing the assessment and test was not the type of "required" exam prohibited by § 12112(d)(4)(A). Defendant required employees

1

to complete the assessment and test only if they wanted to participate in the company's insurance plan. Defendant argues that when viewed from this perspective, the assessment and testing were entirely voluntary and therefore not prohibited by § 12112(d)(4)(A). The parties have each filed and briefed cross-motions for summary judgment, both of which are pending review.

I am denying plaintiff's motion, granting defendant's motion and entering judgment in defendant's favor. Although the applicability of 42 U.S.C. § 12112(d)(4)(A) to the specific type of medical examination requirement at issue here has not been addressed by the Court of Appeals for the Seventh Circuit, I conclude that the protections set forth in the ADA's safe harbor enable employers to design insurance benefit plans that require otherwise prohibited medical examinations as a condition of enrollment without violating § 12112(d)(4)(A). In light of this conclusion, it is unnecessary to address the parties' arguments with respect to whether the assessment and testing is actually "required" in the manner prohibited by § 12112(d)(4)(A). It is also not necessary to address plaintiff's request for a finding that it satisfied its statutory conciliation obligation set forth in 42 U.S.C. § 2000e-5(b) or defendant's request for a finding that plaintiff is not entitled to punitive damages.

From the parties' proposed facts, I find that the following are relevant and not genuinely disputed.

UNDISPUTED FACTS

Defendant manufactures and sells plastic products internationally. The company employs at least 15 people, is engaged in an industry affecting commerce and is a "covered entity" subject to the ADA. One of defendant's manufacturing facilities is located in Baraboo, Wisconsin, which is where Dale Arnold worked from 1990 until 2014.

Defendant offers its employees various employee benefits, one of which is the ability to participate in its health insurance plan. The plan is self-funded and self-insured, but is administered by United Medical Resources. Participation in the health insurance plan is wholly voluntary. Employees are not required to participate in the plan as a condition of their employment. However, Dale Arnold participated regularly in the insurance plan.

In October 2010, defendant established a "wellness program" for those employees that wanted to enroll in defendant's health insurance plan for the 2011 benefit year. The wellness program had two components—a health risk assessment and a biometric test. The health risk assessment required each participant to complete a questionnaire about his or her medical history, diet, mental and social health and job satisfaction. The biometric test was similar to a routine physical examination: among other things, it involved height and weight measurements, a blood pressure test and a blood draw.

The information gathered through the wellness program was used to identify the health risks and medical conditions common among the plan's enrollees. Except for information regarding tobacco use, the health risks and medical conditions identified were reported to defendant in the aggregate, so that it did not know any participant's individual

3

results. Defendant used this information to estimate the cost of providing insurance, set participants' premiums, evaluate the need for stop-loss insurance, adjust the co-pays for preventive exams and adjust the co-pays for certain prescription drugs. Defendant also sponsored weight loss competitions, modified vending machine options and made other "organization-wide changes" aimed at promoting health in light of the fact that a high percentage of defendant's employees appeared to suffer from nutritional deficiencies and weight management problems.

For the 2011 benefit year, which was the first year the wellness program was in place, defendant promoted the program by giving employees a $600 credit if they participated and completed both the health risk assessment and the biometric test. For the 2012 and 2013 benefit years, however, defendant eliminated the $600 credit and instead adopted a policy of offering health insurance only to those employees that completed the wellness program. Participating in the wellness program was not a condition of continued employment, but defendant offered company-subsidized health insurance under its benefit plan to wellness program participants exclusively.

For the 2011 benefits year, Dale Arnold participated in the wellness program, enrolled in defendant's insurance plan and received the $600 credit. However, for the 2012 benefits year, which was the first year participation in the wellness program was required, Arnold failed to complete the program's assessment and tests by the established deadline. Consequently, defendant discontinued Arnold's insurance. Defendant gave Arnold the option of paying the COBRA rate for continued coverage through 2012, but Arnold declined

because he thought the insurance under defendant's benefit plan was too expensive without the subsidy.

Soon after losing his coverage, Arnold filed a union grievance, a complaint with the Department of Labor and a complaint with the EEOC. After discussions with the Department of Labor, defendant agreed to reinstate Arnold's insurance if Arnold completed the plan's required testing and assessment and made his premium contributions. When Arnold agreed, his insurance was reinstated retroactive to January 1, 2012. Despite the compromise reached by Arnold, the Department of Labor and defendant, plaintiff filed this lawsuit on Arnold's behalf, asserting that the plan's testing requirement violated § 12112(d)(4)(A)'s ban on employer mandated medical examinations.

## OPINION

The sole claim at issue in this case is the alleged violation of 42 U.S.C. § 12112(d)(4)(A), which provides that a "covered entity shall not require a medical examination . . . unless such examination is shown to be job-related and consistent with business necessity." In plaintiff's view, defendant violated § 12112(d)(4)(A) by requiring its employees to complete the wellness program's health risk assessment and biometric screening tests before they could enroll in defendant's health insurance benefit plan.

Defendant argues in response that its practice of conditioning enrollment in its benefit plan on completion of the wellness program is protected by the ADA's "safe harbor" for insurance benefit plans set forth in 42 U.S.C. § 12201(c)(2). Section 12201(c)(2)

5

provides in relevant part that the ADA "shall not be construed to prohibit or restrict" an employer from establishing or administering "the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks." Defendant contends that the wellness program requirement constituted a "term" of its health insurance plan and that this term was included in the plan for the purpose of underwriting, classifying and administering health insurance risks. For the reasons set forth below, I agree with defendant that the wellness program requirement is protected by the safe harbor. Accordingly, defendant is entitled to summary judgment in its favor.

As an initial matter, I note that the application of the safe harbor to employer-sponsored wellness programs is a matter of first impression in this circuit. In light of the lack of authority on this issue, defendant urges this court to follow the approach taken by the district court in Seff v. Broward County, 778 F. Supp. 2d 1370 (S.D. Fla. 2011), and affirmed by the Court of Appeals for the Eleventh Circuit in Seff v. Broward County, Florida, 691 F.3d 1221 (11th Cir. 2012), which extended the safe harbor to a wellness program similar to the one at issue here.

In Seff, a former Broward County employee filed a class action alleging that Broward County violated § 12112(d)(4)(A) by deducting $20.00 from the bi-weekly paychecks of all of its employees that enrolled in Broward County's group health plan but refused to participate in Broward County's employee wellness program. Seff, 691 F.3d at 1222. Like the wellness program at issue here, Broward County's program involved both "biometric screening," which included a blood glucose and cholesterol test, and an "online Health Risk

Assessment," which required employees to complete a confidential health questionnaire. Id. The plaintiff in Seff claimed that Broward County violated § 12112(d)(4)(A) because employees were required to participate in the wellness program in order to receive insurance benefits without having to pay a $20.00 surcharge every two weeks. Id. at 1224. Broward County argued in response that its wellness program requirement fell within § 12201(c)(2)'s safe harbor because it was included in the benefit plan to enable the county to underwrite, classify and administer its health insurance risks more effectively. Seff, 778 F. Supp. 2d at 1372. The federal district court for the Southern District of Florida agreed with the county and granted its motion for summary judgment, id. at 1375, and the court of appeals affirmed. Seff, 691 F.3d at 1224.

Plaintiff offers a number of arguments why Seff was wrongly decided and should not be followed. First, it argues that the court erred in Seff because the voluntary "employee health program" exception set forth in § 12202(d)(4)(B), which plaintiff asserts is the exclusive exception to § 12202(d)(4)(A) when it comes to wellness programs, would be "overrun entirely" if the safe harbor applied to defendant's wellness program requirement. This argument fails because it ignores obvious differences between the nature and scope of the protections afforded by § 12201(c)(2)'s safe harbor and those afforded by § 12112(d)(4)(B)'s exception. The § 12201(c)(2) safe harbor provides an exception for medical examinations that are tied to employers' insurance plans, while § 12112(d)(4)(B) provides an exception for medical examinations that are part of "employee health programs" regardless whether the employer sponsors any sort of employee benefit plan at all. In some

7

instances the exception and protections set forth in § 12202(c)(2) and § 12112(d)(4)(B) may overlap but the latter exception is rendered irrelevant only when the wellness program at issue is included as part of an employer's benefit plan.  In other words, when an employer sponsors a wellness program that is not part of the employer's benefit plan, it cannot avail itself of the § 12202(c)(2) safe harbor, but it might still rely on the employee health program exception in § 12112(d)(4)(B) if it satisfies that provision's requirements.  Thus, applying the safe harbor to defendant's wellness program requirement does not nullify § 12112(d)(4)(B)'s exception for voluntary tests or inquiries that are part of an employee health program.

The regulatory rules governing employee health programs recently proposed by plaintiff do little to further plaintiff's argument that § 12202(c)(2)'s safe harbor nullifies the exception set forth in § 12112(d)(4)(B).  Plaintiff's proposed rule provides: "The Commission does not believe that the ADA's 'safe harbor' provision applicable to insurance, as interpreted by the court in Seff v. Broward County, 778 F. Supp. 2d 1370, affirmed, 691 F.3d 1221 (11th Cir. 2012), is the proper basis for finding wellness program incentives permissible." 80 F.R. 21659 at 21662, n.24 (April 20, 2015).  Even if I were bound by plaintiff's proposed regulations, which I am not, Clay v. Johnson, 264 F.3d 744, 750 (7th Cir. 2001) ("[A] proposed regulation does not represent an agency's considered interpretation of its statute and therefore is not entitled to deference.")(internal citations and quotations omitted), plaintiff's proposed regulation speaks only to the safe harbor's application to "wellness program incentives." It says nothing about the safe harbor's

applicability to medical examinations that are part of a wellness program and are used to administer and underwrite insurance risks associated with an employer's health plan. Plaintiff may be correct that relying on the insurance safe harbor in § 12202(c)(2) is not appropriate when there is a stand-alone wellness program unrelated to the administration of insurance risks, but that is not the case it is litigating here.

Next, plaintiff contends that the court is compelled by traditional principles of statutory interpretation to construe § 12201(c)(2) narrowly because it is an "exception" or "proviso," and that by contrast, "[t]he ADA is a remedial statute . . . [and] must be construed with all the liberality necessary to achieve such purposes." Plf.'s Opp. Br. at 15-16 (citing Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority, 635 F.3d 87, 94 (3d Cir. 2011)). However, plaintiff does not explain the specific manner in which § 12201(c)(2) should be construed narrowly or how a narrow construction would result in the wellness program requirement's falling outside the safe harbor. The general rule of statutory interpretation that an exception is to be construed "narrowly" does not allow a court to ignore the exception altogether so as to deprive a party of its protections whenever the party's conduct falls within the exception's scope.

Ultimately, I am not persuaded by plaintiff's argument that the safe harbor cannot be construed as applying to wellness programs, regardless whether the wellness program is part of an employer's insurance benefit plan. The fact that wellness programs may fall within the scope of the exception set forth in § 12112(d)(4)(B) does not mean that they cannot also be protected by § 12201(c)(2)'s safe harbor.

9

Having concluded that the safe harbor may extend to wellness programs that are part of an insurance benefit plan, I must consider whether the safe harbor applies in this instance. Specifically, it is necessary to determine whether the wellness program requirement is a "term" of defendants' insurance benefit plan and is based on "underwriting risks, classifying risks, or administering such risks." 42 U.S.C. § 12201(c)(2). (The safe harbor also requires that the term must not be inconsistent with state law, but plaintiff does not argue that defendant violated this requirement).

It is clear that the wellness program requirement was a "term" of defendant's benefit plan. First and foremost, plaintiff's entire claim is premised on its undisputed allegation that defendant's employees were required to complete the wellness program before they could enroll in the plan. It is difficult to fathom how such a condition could be anything other than a plan term. Additionally, plaintiff does not allege that defendant failed to provide its employees adequate notice of the wellness program requirement. The undisputed facts establish that defendant distributed handouts to its employees informing them of the wellness program requirement and also scheduled the wellness program's health risk assessments and biometric testing so that they would coincide with the plan's open enrollment period. Finally, the plan's summary plan description explained that participants would be required to enroll "in the manner and form prescribed by [defendant]," which put employees on notice that there might be additional enrollment requirements not spelled out in the summary plan description.

Plaintiff argues that notwithstanding these facts, the wellness program requirement

10

does not qualify as a "term" of defendant's benefit plan because it was not set forth explicitly in either the insurance plan's summary plan description or the collective bargaining agreement between defendant and its employees. However, the fact that the wellness plan requirement was not set forth in the summary plan description or collective bargaining agreement is not dispositive. Although plaintiff is correct that 29 U.S.C. § 1022(a) requires plan fiduciaries to provide plan participants summary plan descriptions that identify a "plan's requirements respecting eligibility for participation and benefits," it is well-recognized that a summary plan description does not establish the terms of an employee benefit plan. Mers v. Marriott International Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1023 (7th Cir. 1998) ("[A summary plan description's] silence on an issue does not estop a plan from relying on the more detailed policy terms when no direct conflict exist[s]."). In fact, a benefit plan may be established without any written document whatsoever. Williams v. WCI Steel Co., Inc., 170 F.3d 598, 602 (6th Cir. 1999) ("The purported plan need not be formal or written to qualify as an ERISA benefit plan[.]"); Smith v. Hartford Ins. Group, 6 F.3d 131, 136 (3d Cir. 1993) ("ERISA does not define the critical term 'plan.' But we have ruled that a plan need not be written[.]"). Thus, the fact that neither the summary plan description nor the collective bargaining agreement identifies the wellness program requirement does not mean that this requirement was not a term of the benefit plan.

I also conclude that the wellness program requirement was "based on underwriting risks, classifying risks, or administering such risks." 42 U.S.C. § 12201(c)(2). Although

there is limited case law analyzing these terms, other courts have held that "underwriting risks, classifying risks, or administering such risks" refers simply to the process of developing an insurance plan. Seff, 778 F. Supp. 2d at 1374 ("[T]hese terms collectively refer to the process of collecting information about the health of the insured in order to assess risks so the insurer may accurately establish premiums—in other words: the process of developing insurance plans. The safe harbor provision aims to protect this process."); Zamora-Quezada v. HealthTexas Medical Group of San Antonio, 34 F. Supp. 2d 433, 443 (W.D. Tex. 1998). See also H.R. Rep. No, 101-485, p. 70 (May 15, 1990) ("The Committee added this provision because it does not intend for the ADA to affect legitimate classification of risks in insurance plans in accordance with the state laws and regulations under which such plans are regulated.").

The wellness program requirement was clearly intended to assist defendant with underwriting, classifying or administering risks associated with the insurance plan. The undisputed evidence establishes that defendant's consultants used the data gathered through the wellness program to classify plan participants' health risks and calculate defendant's projected insurance costs for the benefit year. They then provided recommendations regarding what defendant should charge the plan participants for maintenance medications and preventive care. They also made recommendations regarding plan premiums, which included a recommendation that defendant charge cigarette smokers higher premiums. Finally, after identifying the risks through the wellness program, defendant decided to purchase stop-loss insurance as a hedge against the possibility of unexpectedly large claims.

These types of decisions are a fundamental part of developing and administering an insurance plan and therefore fall squarely within the scope of the safe harbor.

Notwithstanding the various ways in which defendant used the wellness program data, plaintiff argues that the wellness program requirement was not a protected term of the benefit plan because it was not "necessary" to enable defendant to classify, underwrite or administer plan participants' health risks. However, plaintiff offers no authority for such a construction of the safe harbor. The safe harbor applies to any plan terms "based on" classifying, underwriting or administering health risks. The fact that defendant could have potentially designed and administered an insurance plan without requiring participants to complete the wellness program is irrelevant.

The final issue is whether defendants are using the safe harbor as a "subterfuge," something which is expressly prohibited by the safe harbor itself. Specifically, Section 12201(c)(2) states that the safe harbor "shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter." 42 U.S.C. § 12201(c)(2). Plaintiff argues that defendant used the safe harbor as a subterfuge to deprive its employees of their "right not to be examined or give disability-related information." Plf.'s Opp. Br. at 23. This argument is based on a flawed understanding of the ADA's purpose.

As an initial matter, defendant argues that plaintiff cannot raise this issue because it did not raise it in its pleading. Defendant cites Aquino v. Prudential Life & Cas. Ins. Co., 419 F. Supp. 2d 259 (E.D.N.Y. 2005), in which the court held that "a plaintiff asserting an ADA claim regarding the underwriting, classifying, or administering of risks 'has the . . .

obligation to plead (and prove) that the insurance practice complained of is not consistent with state law or is being used as a subterfuge[.]" Id. at 270.  I do not agree with defendant on this point because Aquino and the cases on which it relies involved claims against insurance companies for practices that unquestionably fell within the safe harbor.  Here it was not clear from the outset that the safe harbor applied.  Until defendant raised the prospect that the testing and assessment were covered by the safe harbor, plaintiff did not have cause to allege that the safe harbor was being used as a subterfuge.  Nevertheless, I agree with defendant on the merits that the wellness program was not a subterfuge.

For the wellness program requirement to be a subterfuge, plaintiff must establish that the program was incorporated into the plan to "evade the purposes of Title[s] I and III."  42 U.S.C. § 12201(c). Contrary to plaintiff's contention, the purpose of the ADA is not to prohibit employers from asking for medical and disability-related information.  Instead, its purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  I agree with the district court's determination in Piquard v. City of East Peoria, 887 F. Supp. 1106, 1125 (C.D. Ill. 1995), that a benefit plan term does not operate as a subterfuge unless it involves a "disability-based distinction" that is used to discriminate against disabled individuals in a non-fringe benefit aspect of employment.  Defendant's wellness program clearly did not involve such a distinction or relate to discrimination in any way. Regardless of their disability status, all employees that wanted insurance had to complete the wellness program before enrolling in defendant's plan.  Furthermore, there is no evidence that defendant used

14

the information gathered from the tests and assessments to make disability-related distinctions with respect to employees' benefits.

ORDER

IT IS ORDERED that

1. Plaintiff Equal Employment Opportunity Commission's motion for partial summary judgment, dkt. #15, is DENIED. Defendant Flambeau, Inc.'s motion for summary judgment, dkt. #9, is GRANTED.

2. Plaintiff's claim that defendant violated 42 U.S.C. § 12112(d)(4)(A) is DISMISSED WITH PREJUDICE.

3. The clerk of court is directed to enter judgment accordingly.

Entered this 30th day of December, 2015.

BY THE COURT:

/s/
BARBARA B. CRABB
District Judge